IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v. CRIMINAL NO. 2:26-00052-01

CLARENCE JEAN MILLER

**MEMORANDUM OPINION**

By Order entered on September 16, 2026, the court granted defendant's motion to suppress the cell phone seized on July 8, 2025. The reasons for that decision follow.

I. Background

The two-count indictment in this case charges defendant with one count of distribution of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and 2252A(b)(1), (Count One); and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2), (Count Two). Defendant has moved to suppress the cell phone that was seized on July 8, 2025, as well as "any and all statements attributed to him respecting his cel[l] phone, or the messaging app 'Kik' on July 8, 2025." ECF No. 26 at 1.

The court held a suppression hearing on July 27, 2026.[1] The only witness testifying at the suppression hearing was Trooper

[1] At the conclusion of that hearing, the court requested further briefing from the parties. Supplemental briefing was completed on August 18, 2026.

Ricky Jones. The court found Trooper Jones's testimony credible and relies on it in making these findings of fact.

On May 28, 2025, Trooper Jones, of the West Virginia State Police ("WVSP"), received CyberTipline Report 208102100 regarding the distribution of suspected child pornography and/or child sexual abuse material ("CSAM"). See Transcript of July 27, 2026, Hearing at 6 (hereinafter "Tr. at ___"); Gov't Ex. 1. At that time, Trooper Jones, a nine-year employee with the WVSP, was an investigator with the Crimes Against Children Unit and a task force officer with the FBI's Violent Crimes Against Children Task Force. See Tr. at 4-5. CyberTipline Report 208102100 (hereinafter "the CyberTip")[2] was submitted by Kik,[3] a

[2] Trooper Jones explained that "[a] CyberTip is a report from an electronic service provider, such as Facebook, Kik, Meta, Snapchat. Anytime that you create an account, you're giving that social media application permission to view any messages, videos, and photographs that you send or receive. Any time they see any messages, photographs, or videos that appear to have CSAM in it, they report that to the National Center for Missing and Exploited Children, better known as NCMEC." Tr. at 6.

[3] According to Trooper Jones, "Kik is a social media application. You can chat with individuals within your area in which you reside, across the United States, or across the world. You can send videos, pictures, receive files or send files, videos, or photographs." Tr. at 7. Trooper Jones testified that Kik could only be used on cell phones or tablets. See id.

social media messaging application for mobile devices such as cell phones and tablets. See Tr. at 6-7; Gov't Ex. 1 at 4.

According to the CyberTip, on March 15, 2025, Kik user "cjsmill," who had registered for Kik using the email address "c92110285@gmail.com," had shared three videos and two images depicting child pornography in a private chat message to another Kik user. See Tr. at 8-9; Gov't Ex. 1 at 4, 10-14. The CyberTip also included a number of Internet Protocol ("IP") addresses[4] from which the user logged in to Kik. See Tr. at 9; Gov't Ex. 1 at 4-9. According to the CyberTip, those IP addresses were serviced by AT&T Wireless and/or US Cellular. See Tr. at 9-10; Gov't Ex. 1 at 15.

Trooper Jones reviewed the CyberTip and confirmed that the images and videos submitted with the CyberTip in fact depicted child pornography. See Tr. at 11. Trooper Jones also reviewed the response to an administrative subpoena that North Carolina law enforcement had sent to Google seeking information about the "c921102585@gmail.com" email address. See Tr. at 10-11.[5]

---

[4] Trooper Jones explained that an IP address is "basically a digital fingerprint. The IP address is unique to a business, residence, or a cellular device." Tr. at 9.

[5] Trooper Jones testified that the CyberTip was originally forwarded to law enforcement in North Carolina but later forwarded to him in West Virginia when it appeared the gmail

Google's response indicated that Clarence Miller was attached to the c921102585@gmail.com address. See Tr. at 11.

The most recent login to the account was in May of 2025. See id. Trooper Jones traced the IP address to service provider Optimum. See id. at 11-12. The gmail user had also logged into the account several times in March of 2025 and Trooper Jones testified a comparison of the IP addresses matched up to those IP addresses associated with the Kik logins from the CyberTip. See id. at 12. Account recovery information for the gmail account listed "cjmiller1024@outlook.com" as a recovery email address and a West Virginia cell phone number ending in 749 as an account recovery phone number. See id. at 12-13. Billing information for the gmail account came back to a Clarence Miller. See id. at 13. There were three addresses associated with the account, all in West Virginia and the most recent one being 334 Jones Avenue, Apartment 2, in Oak Hill, West Virginia. See id.

An android cell phone was connected to the 749 phone number associated with the gmail account. See id. Trooper Jones was able to discover that AT&T was the wireless provider for that

address was for a subscriber located in West Virginia. See Tr. at 10-11.

phone number. See id. at 13-14. A subpoena sent to AT&T showed that the subscriber for that phone number was Clarence Miller. See id. at 14. A subpoena sent to Microsoft showed that Outlook email address was tied to Clarence Miller as well. See id.

A subpoena to Optimum revealed that the subscriber for that internet account was Christop Breckenridge, defendant's brother and the service address was 334 Jones Avenue, Apartment 2, Oak Hill, West Virginia. See id. at 14-15.

On May 30, 2025, Trooper Jones obtained a state search warrant for the "cjsmill" Kik account. See id. at 15; Gov't Ex. 2. Upon receiving Kik's response to the subpoena, Trooper Jones received not only the images and videos of child pornography submitted with the CyberTip but also received seven additional photographs of child pornography. See Tr. at 16. Trooper Jones also viewed photographs and video of an adult male whom he determined was defendant. See id. at 16. He also viewed a verification video that was sent on February 20, 2025. See id. at 16-17.[6] Kik also provided a spreadsheet of message exchanges

[6] Trooper Jones explained what a verification video was based upon his training and experience. See Tr. at 16-17. According to him, "a lot of individuals, because they know that law enforcement are monitoring and they also do chatting operations on different social media sites, some users who share CSAM, they want what they call verification videos to verify that the person that they're sending or sharing the CSAM with isn't law

between "cjsmill" and other Kik users. See id. at 18. In those chats, "cjsmill" identified himself as a forty-year-old man from West Virginia, distributed child pornography to a fellow Kik user, and talked about his "fantasies about having sex with children." Id.

In late June or early July, in an effort to confirm defendant's residence, Trooper Jones enlisted Trooper Stewart of the Oak Hill detachment, to go to the apartment on Jones Avenue in Oak Hill, West Virginia, that was associated with the Optimum IP address used to access the Gmail account that registered the "cjsmill" Kik account. See id. at 18-19, 35. Trooper Stewart went to the residence to perform a 911 hangup ruse, which Trooper Jones explained was when a law enforcement officer knocks on a door and asks if someone called 911 to verify if someone is actually living at a residence. See id. Defendant answered the door when Trooper Stewart knocked on the door. See id. at 19.

---

enforcement. And it's also a way - - so if they get in trouble and a person tells on them, it's like I have this proof that this person sent me a video asking me for the child porn. So it's sort of, if I tell on you - - if you tell on me, I'm going to tell on you." Tr. at 17.

On[7] July 8, 2025, Trooper Jones and Trooper Stewart went to defendant's apartment. See id. at 19.[8] Trooper Jones testified that he went there to arrest defendant.

> Q: Okay. I want to be clear. At least from the way you started your interaction with Mr. Miller, you went there to arrest him. You had enough to do it?
>
> A: Correct.
>
> Q: Okay. It wasn't something you decided to do on the doorstep or after interacting with him, you had decided when you went to approach him you were going to arrest him?
>
> A: Correct.

Id. at 45. Trooper Jones did not have a warrant for defendant's arrest nor did he have a search warrant for the apartment. See id. at 19.

Upon arriving at Miller's apartment, the officers knocked on the door several times before defendant answered. See id. at 20; Gov't Ex. 3. When defendant came to the door, he was wearing only shorts, with no shoes or shirt. See Tr. at 20. According to Trooper Jones, after Miller opened the door, "I

---

[7] Trooper Jones testified that he had probable cause to arrest Miller before he knocked on the door. See Tr. at 35-36. When asked if he had time to get an arrest warrant, Trooper Jones said he didn't need a warrant because Miller was being charged with a felony. See id. at 36.

[8] The officers' actions were audio recorded. See Gov't Ex. 3.

identified myself and the reason I was there, because of a child porn investigation. And I informed Mr. Miller that he was going to be arrested for distribution and possession of child pornography." Id.

Trooper Jones testified that he and Trooper Stewart "were standing on the front porch to the apartment" and defendant was standing "[i]n the doorway" when they told defendant he was under arrest. Id. at 22, 47-48. Trooper Jones told defendant that he would need to "get some shoes on" and that they would show him the evidence against him once they got to the detachment. Gov't Ex. 3; Tr. at 23, 48. Trooper Jones testified that he wanted defendant to put shoes on "[f]or a little bit of humility. He didn't have a shirt on, he had shorts on, no shoes. And also for his safety. I could not let him walk across the bare concrete or ground and risk him stepping on a piece of glass or something like that and injuring himself" Tr. at 23.

Jones also told defendant that he would "have to come in [the apartment] with" him to make sure [Defendant] ain't got no weapons or anything, okay?" Gov't Ex. 3; Tr. at 23. Trooper Jones testified that he needed to enter the apartment to keep his eye on Miller for officer safety. See Tr. at 38, 49.

Defendant then went inside the apartment, leaving the door open, and Trooper Jones and Trooper Stewart followed him inside. See Tr. at 23, 48-50.

Defendant was not handcuffed at that time. See id. at 23. However, Trooper Jones testified that defendant was still under arrest. See id. at 40.

Just inside the front door was the living room of the apartment. See id. at 23. Defendant was using part of the living room as a bedroom. See id. at 24. The bed was on the right as you entered the house and behind the front door. See id. There was a nightstand beside the bed with a pack of cigarettes and a cell phone sitting on it. See id. Trooper Jones was about "four to five steps" inside the living room as he watched defendant put on a shirt and shoes. See id. The shoes were on the floor beside the bed, and the shirt was on top of the nightstand. See id. at 24-25. Trooper Jones noticed an Android cell phone on the nightstand and believed it belonged to defendant because he knew people usually kept their cell phones nearby. See id. at 25-26, 50-51. Other than a television, the cell phone was the only electronic device Trooper Jones saw in the room. See id. at 26. Trooper Jones confirmed that he only

saw the cell phone once he was inside the apartment. See id. at 50-51.

Trooper Jones asked defendant if the cell phone was his, and defendant said that it was. See Gov't Ex. 3. Trooper Jones initially told defendant to bring the cell phone with him, but he then said, "No, as a matter of fact, the cell phone . . . I'm taking, okay? It's going to be used as evidence." Gov't Ex. 3; see also Tr. at 41. Trooper Jones told defendant that he would obtain a search warrant for the cell phone, and if the cell phone had more "child stuff," defendant could be facing additional charges. Gov't Ex. 3, Tr. at 41. Trooper Stewart then asked defendant if there was "a laptop or computer that [he was] using," but before defendant could answer, Trooper Jones told Trooper Stewart that Kik could only be used on a cell phone or tablet. Gov't Ex. 3, Tr. at 26.

Trooper Jones then patted defendant down and told him he would not be handcuffed until they were outside at Trooper Jones's police cruiser. See Gov't Ex. 3. Trooper Jones asked if defendant needed to get his keys to lock the front door, and defendant said no, but he wanted to let his brother know what was going on. See id. Trooper Jones asked defendant how old his brother was, but instead of answering, defendant yelled his

brother's name a few times. See id. Trooper Jones asked defendant to confirm his brother's name and if the internet was registered to his brother, and defendant replied in the affirmative to both questions. See id. Defendant shouted for his brother once again, then said, "He's still asleep. It'll be fine." Id. Defendant and the troopers walked to Trooper Jones's police cruiser, where Trooper Jones handcuffed defendant. See id. Trooper Jones then buckled defendant in the backseat of the cruiser. See id.

The following day, on July 9, 2025, Trooper Jones obtained a search warrant to search the contents of the seized cell phone. See id. at 26-28; Gov't Ex. 5.

## II. Analysis

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "As that text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" Lange

v. California, 594 U.S. 295, 301 (2021) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).

The Supreme Court has been crystal clear: "'[W]hen it comes to the Fourth Amendment, the home is first among equals.'" Id. at 303 (quoting Florida v. Jardines, 569 U.S. 1, 6 (2013)); see also United States v. Griffin, No. 22-4257, --- F.4th ----, ----, 2026 WL 2357208, at *4 (4th Cir. Aug. 14, 2026) ("The protections of the Fourth Amendment are at their apex when it comes to the home.").[9] "That standard 'generally requires the obtaining of a judicial warrant' before a law enforcement officer can enter a home without permission." Lange, 594 U.S. at 301 (quoting Riley v. California, 573 U.S. 373, 382 (2014)).

"An arrest warrant is always required for an arrest inside the arrestee's home, even when probable cause exists, absent exigent circumstances." United States v. McGraw, 920 F.2d 224, 228 (4th Cir. 1990) (citing Payton v. New York, 445 U.S. 573 (1980)). In Payton, the Court found unconstitutional a New York statute allowing law enforcement to enter a home to make a

[9] "[T]he area 'immediately surrounding and associated with the home'—what our cases call the curtilage—[are] 'part of the home itself for Fourth Amendment purposes.'" Jardines, 569 U.S. at 6 (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)).

felony arrest. See Payton, 445 U.S at 575. According to the Court:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S. Ct. 679, 683, 5 L.Ed.2d 734. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

Id. at 589-90.

In cases following the decision in Payton, the "Court has repeatedly declined to expand the scope of exceptions to the warrant requirement to permit a warrantless entry in the home." Caniglia v. Strom, 593 U.S. 194, 199 (2021) (cleaned up); see also Lange, 594 U.S. at 313 (holding that "[t]he flight of a suspected misdemeanant does not always justify a warrantless entry into a home"); Kirk v. Louisiana, 536 U.S. 635, 638 (2002) (holding that warrantless arrest of arrestee in his home and search incident thereto violated Fourth Amendment because "[a]s Payton makes plain, police officers need either a warrant or

probable cause plus exigent circumstances in order to make a lawful entry into a home”).

The government argues that the cell phone was seized lawfully pursuant to the plain view exception to the warrant requirement. “The Fourth Amendment’s protection against unreasonable searches is not implicated when the plain view doctrine applies.” United States v. Runner, 43 F.4th 417, 421 (4th Cir. 2022); see also Washington v. Chrisman, 455 U.S. 1, 5-6 (1982) (“The ‘plain view’ exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be.”). “Viewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search implicating the Fourth Amendment.” Runner, 43 F.4th at 421 (cleaned up). “To satisfy the plain view exception, ‘the government must show that: (1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a lawful right of access to the seized items; and (3) the incriminating character of the items was immediately apparent.’” United States v. Davis, 94 F.4th 310, 319 (4th Cir. 2024) (quoting United States v. Davis, 690 F.3d at 226, 233 (4th

Cir. 2012)). In this case, the government cannot satisfy the plain view exception because Trooper Jones was not lawfully inside Miller's apartment when he saw the phone on the nightstand.

In United States v. McGraw, police knocked on the door of a hotel where a suspect was staying. 920 F.2d 224, 226 (4th Cir. 1990). The suspect opened the door about halfway and, upon seeing the police, attempted to close it. See id. Officers with weapons forced their way into the hotel room and arrested the suspect. See id. After obtaining the suspect's consent to search the room, the police found a suitcase containing incriminating evidence. See id. The district court denied a motion to suppress the contents of the suitcase seized in the hotel room. See id. at 226-27.

The United States Court of Appeals for the Fourth Circuit reversed, "hold[ing] that a person does not surrender his expectation of privacy nor consent to the officers' entry by [partially opening a hotel door to determine the identity of the person knocking], and that his arrest inside his room under such circumstances is contrary to the fourth amendment and the United States Supreme Court's decision in Payton v. New York, 445 U.S. 573 [ ] (1980))." Id. at 228. In so holding, the McGraw court

discussed another Supreme Court case, New York v. Harris, 495 U.S. 14 (1990), in which the Court "suggest[ed] that the police may not forcibly or coercively gain admittance to a private residence to effect an arrest simply by obtaining the arrestee's presence at the door." Id. at 229. In that case,

> police officers with guns drawn knocked on the arrestee's apartment door but received no response. When the suspect looked out of the peephole of the door, one of the officers displayed his badge. The suspect then opened the door and allowed the officers to enter. Once inside, the officers asked the suspect a series of questions which resulted in an admission of guilt. The officers then formally arrested the suspect, although they had probable cause for the arrest before entering the apartment.
>
> The Supreme Court accepted the state court's finding that the suspect did not consent to the officers' entry and said, "It is also evident, in light of Payton, that arresting Harris in his home without an arrest warrant violated the Fourth Amendment." Harris, 110 S. Ct. at 1642. The Court further explained that Payton drew a line at the entrance to the home which the police could not breach without a warrant, absent exigent circumstances.

Id. at 229 (citing Harris).

The United States argues that Miller's arrest was lawful because Trooper Jones and Trooper Stewart did not force defendant to open his door and he "did not retreat into the apartment or try to shut the door." ECF No. 34 at 2. And, according to the government, "when someone is standing in the

doorway of his home, he is in a public place for Fourth Amendment purposes." Id. The court disagrees.

A case from the United States Court of Appeals for the Second Circuit is instructive. In that case, United States v. Allen, the court held that "where law enforcement officers have summoned a suspect to the door of his home, and he remains inside the home's confines, they may not effect a warrantless 'across the threshold' arrest in the absence of exigent circumstances." 813 F.3d. 76, 82 (2d Cir. 2016). In Allen, four police officers went to Allen's apartment "with the preformed plan to arrest him." Id. at 78 (cleaned up). "Despite having nearly two days and ample probable cause, the officers did not seek a warrant for Allen's arrest." Id. After the officers knocked on Allen's first-floor door, he stepped onto his second-floor porch and one of the officers asked Allen to come down to speak to them. See id. at 79. Allen complied, opened the door to his apartment and spoke with the officers. See id. During the interaction, he remained "inside the threshold" and the officers remained on the sidewalk. See id.

At some point, the officers told Allen that he would need to come down to the station to be processed; "[i]n other words, he was under arrest." Id. Allen, who was not wearing shoes,

asked whether he could grab shoes and tell his 12-year-old daughter who was upstairs that he was leaving. See id. The officers told Allen he could not return upstairs unless they came with him. See id. The officers came into the apartment with Allen and recovered marijuana from Allen's person and they also saw drug paraphernalia in plain view. See id. Based in part on the marijuana in Allen's pockets and the drug paraphernalia they saw when they entered the apartment, the officers applied for and obtained a search warrant for the apartment. See id. During execution of the search warrant, officers found a handgun and, based upon that, Allen was eventually charged in federal court with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). See id.

Allen moved to suppress the firearm and the statements he made to law enforcement "contending that both were fruits of a warrantless in-home arrest in violation of the Fourth Amendment." Id. The district court denied the suppression motion. See id. The appeals court reversed. See id. at 80.

Noting the "'heavy burden'" the government faces "when attempting to justify warrantless arrests in the home," the court held "that irrespective of the location or conduct of the

arresting officers, law enforcement may not cause a suspect to open the door of the home to effect a warrantless arrest of a suspect in his home in the absence of exigent circumstances.” Id. at 85 (quoting Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984)). The Allen court observed that “[a]s a practical matter, allowing the police to arrest a subject in his home, even without first entering the home, would undermine the barrier against government intrusions into the home that the warrant requirement attempts to erect. In cases like this one, the arrest takes place in the home, and as this case illustrates, a physical intrusion into the home will very frequently follow the arrest.” Id. at 86.

In reaching its result, the Allen court specifically rejected several of the arguments that the government makes in this case. For example, the government argues that Miller “stood in the doorway and did not retreat into the apartment or try to shut the door.” ECF No. 34 at 2. It also points to the fact that Trooper Jones and Trooper Stewart did not use force or otherwise coerce Miller into opening the door. See id. at 4 (“Before they arrested Defendant, Trooper Jones and Trooper Stewart behaved as two private citizens would have, knocking on Defendant’s front door and waiting for an answer. They never

exercised their authority as police officers to coax or force Defendant to open the door. . . . Defendant was not significantly outnumbered by the police or confronted with a weapon, nor was he subjected to other similarly coercive tactics.”). The Allen decision addresses the weaknesses and unworkability of those arguments:

> By advising Allen that he was under arrest, and taking control of his further movements, the officers asserted their power over him inside his home. That they did so is evident if we consider what would have happened if Allen, after being told in effect that he was under arrest, had simply closed the door and retreated deeper into his home. It is inconceivable that the officers would at that point have shrugged their shoulders and turned away. An arrested person is, and should be, arrested: When the police are authorized to take a person into custody, and undertake to do so, they must have the authority to make the arrest effective if the suspect refuses to comply.
>
> A rule that permitted an arrest "across the threshold," but allowed the arrested person to refuse the arrest simply by closing the door, would not be viable, for it would undermine the authority of the police and encourage resistance by those who were aware of the rule.
>
> * * *
>
> In short, we embrace the rule . . . that where law enforcement officers summon a suspect to the door of his home and place him under arrest while he remains within his home, in the absence of exigent circumstances, Payton is violated regardless of whether the officers physically cross the threshold. That rule applies regardless of whether the police "constructively" or "coercively" entered the apartment

> through shows of force or authority beyond that conveyed by the simple command to the occupant to submit to arrest. We believe that this rule provides clear guidance to law enforcement, avoids undue complexities and perverse incentives to householders not to open their doors to inquiring police officers, and most importantly, ensures that the Fourth Amendment protections, which are at their zenith in the home, are adequately protected.

Id. at 86, 88-89. The court finds the Allen decision persuasive.

As the United States did in McGraw, the government in this case cites United States v. Santana, 427 U.S. 38, 42 (1976), for the proposition that the doorway to a home is a public place for Fourth Amendment purposes. However, the facts in Santana, are easily distinguishable from those in this case. In that case, as police drove up to Santana's residence based upon a tip from another arrestee minutes earlier, Santana was already standing in the doorway holding a bag which the officers believed contained drugs. See id. at 40. When law enforcement exited their vehicles shouting "police," and displaying their identification, Santana retreated into the vestibule of her home where she was arrested. See id. at 40-41. In finding Santana's arrest did not violate the Fourth Amendment, the Court held that the doorway was not an area where Santana "had any expectation of privacy" because she was "as exposed to public view, speech,

hearing, and touch as if she had been standing completely outside her house." Id. at 42. Characterizing the case as involving a "hot pursuit," the Court held "that a suspect may not defeat an arrest which has been set in motion in a public place, . . . by the expedient of escaping to a private place." Id. at 43.

Unlike Santana, this case did not involve a "hot pursuit." Nor was defendant already standing in his doorway, when Trooper Jones and Trooper Stewart arrived. Therefore, he had not "voluntarily expose[d] himself to the public to the same extent as the arrestee in Santana." McGraw, 920 F.2d at 229.

The other case cited by the United States is also of little help in justifying the warrantless arrest of Miller in this case. In that case, United States v. Cephas, 254 F.3d 488, 490 (4th Cir. 2001), police went to knock on Cephas's door after an informant told them he had "just come from an apartment where a 14 year old girl was smoking marijuana with a man named Cephas." The door was opened by Cephas and the police observed a young girl sitting in the apartment as well as the strong smell of marijuana coming from the apartment. See id. When Cephas tried to shut the door, the police officer pushed his way into the apartment. See id. at 491. A search of the apartment recovered

marijuana, crack cocaine, and firearms. See id. The district court granted defendant's motion to suppress the evidence recovered during the search as well as evidence that the police smelled marijuana coming from the apartment. See id. at 492.

The appeals court reversed. See id. at 496. With respect to the evidence that the police saw a young girl sitting in the apartment and smelled marijuana coming from the apartment, the court found there was no "search within the meaning of the Fourth Amendment" because Cephas "voluntarily exposed to the public any odors and such a view as one standing at the door could perceive." See id. at 494. As to warrantless entry into the apartment, the court found it was justified by exigent circumstances. See id. at 495-96.

This case has little in common with Cephas. For starters, the phone that was seized in this case was not visible from Trooper Jones's view outside the apartment. Trooper Jones only saw it once he entered Miller's apartment. Furthermore, in this case, there were no exigent circumstances present[10] that would

[10] And the government has not even argued that there were exigent circumstances justifying law enforcement's actions in this case.

justify law enforcement's warrantless entry into Miller's apartment.

The government has failed to show why the rule of Payton should not apply to this case. See (United States v. Boyd, 826 F. Supp.3d 669, 679 (D.S.C. 2025) ("The Court, therefore, concludes that the warrantless seizure of Boyd at his back steps---within his home or its curtilage--- violated the Fourth Amendment.). The plain view exception cannot justify seizure of the phone from defendant's apartment.

## III. Conclusion

Having concluded that the seizure of the phone was not justified under the plain view doctrine, the court finds that it was seized in violation of the Fourth Amendment. And, while suppression of evidence seized in violation of the Fourth Amendment is not always mandatory, the government has not argued that the exclusionary rule should not apply. Based on the foregoing, defendant's motion suppress the phone was granted.

The Clerk is directed to send a copy of this Memorandum Opinion to counsel of record and to the Probation Office of this court.

IT IS SO ORDERED this 18th day of September, 2026.

ENTER:

David A. Faber
Senior United States District Judge